**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| James Ulery, | |
| Plaintiff, | |
| v. | Case No.: 20-cv-50477 |
| | Judge Iain D. Johnston |
| Officer Mark DeLacy, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

"I feel like I've been getting poisoned for the last thirty-something fucking days," Plaintiff James Ulery announced from the backseat of a squad car, headed for the Winnebago County Jail. Dkt. 112, 14:29. Though the Court would prefer to let Ulery speak for himself, his own narrative doesn't make for easy reading. For the next eighty minutes, Ulery discussed his relationship with his wife, his opinion of her parenting, potential custody issues, the contents of a cousin's phone, the types of buses around town, and the prominence of police protests around the country:

> I pulled up a picture of my television, with the mount on it and everything, in my cousin's phone yesterday, sir. How the fuck's he got a picture of my TV in my house with the mount on it and everything, you know what I mean? I'm the one that bought it at the pawn shop, and I put the wall-mount kit . . . and, uh, I do believe my wife has been trying to poison me.
> *Id.* at 14:30.

After listening quietly, an officer of the Rockford Police Department reached a different conclusion: "I think it's probably because you haven't done meth for four days," said Defendant Mark DeLacy. *Id.* at 15:05.

1

It's difficult to summarize the long and winding road that led Officer DeLacy to this conclusion. So, the following background comes with a caveat that the Court's summary is necessarily more organized (and less profane) than Ulery's own statements.

***

During an investigatory detention on suspicion of domestic battery, Plaintiff James Ulery accused his wife of sneaking him illicit substances without his knowledge. By way of explanation, Ulery added, "Some things have been changing, like on houses, vehicles, stuff like that. That's why I got the idea that possibly I'm being drugged. Because I'm seeing things like the buses—I just seen a bus drive by— and like yesterday it was the same kind of buses." *Id.* at 14:53–54. When Officer DeLacy said he didn't know anything about that, Ulery switched topics again: "I am serious about what I found in my cousin's phone in his house with him, and it's like, what the hell?" *Id.* at 14:54.

None of this persuaded Officer DeLacy to take Ulery for toxicology testing, as Ulery had repeatedly requested. Instead, Officer DeLacy reached his own theory when Ulery admitted that he'd recently stopped using methamphetamines. *Id.* at 14:55, 15:07. So begins the stalemate: For approximately eighty minutes, Ulery begged Officer DeLacy for immediate toxicology testing, and Officer DeLacy recommended that Ulery seek help elsewhere. *Id.* at 15:04.

When they arrived at the Winnebago County Jail, Ulery exited the squad car without assistance and met with Officer Tim Cox of the Winnebago County Sheriff's

2

Department. Dkt. 122 at ¶ 27. Officer Cox ordered Ulery to stand inside a body scanning machine to check for contraband, and Ulery fell backwards from the machine onto his tailbone. *Id.* at ¶¶ 34, 43. When Officer Cox asked Ulery if he was okay, Ulery said he didn't know, and again repeated his involuntary intoxication theory. Dkt. 125 at ¶ 6. Like Officer DeLacy, Officer Cox declined to provide toxicology testing. But when Ulery followed up on his spine injury one week later, Jail employees discovered that he needed spinal surgery. Dkt. 132 at ¶¶ 22–23.

After receiving the necessary surgery, Ulery sued Officer DeLacy and the Winnebago County Sheriff's Department for what he viewed as constitutionally inadequate medical care in violation of the Eighth and Fourteenth Amendments. For the reasons explained below, the Court grants summary judgment to both Defendants.

## I.  Legal Standard

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must construe the "evidence and all reasonable inferences in favor of the party against whom the motion under consideration is made." *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant; it does not require that the dispute be resolved conclusively in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). However, "the nonmoving party 'must do more than simply show there is some

metaphysical doubt as to the material facts.'" *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir. 1996) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Speculation is insufficient to withstand summary judgment." *Id.*

## II. Analysis

Before reaching the merits of Ulery's claims, the Court expended considerable time and effort to determine which material facts were genuinely disputed. Like many district courts, the United States District Court for the Northern District of Illinois possesses a local rule *theoretically* designed to streamline summary judgment filings. In practice, however, the parties' application of the rule—or lack thereof—often results in the rule's goal being unfulfilled. The Court won't belabor each time that Ulery violated Local Rule 56.1. But, to give a short example, Ulery disputes the statement that no medical provider has ever diagnosed him with a stroke "because Plaintiff was never assessed for a stroke following his arrest." Dkt. 121 at ¶ 40. This argument comes full circle: If Ulery hasn't had a stroke evaluation, of course, he hasn't had a diagnosis, either. Later—in a more flagrant violation—Ulery's counsel contends that he suffered from partial paralysis in Officer DeLacy's custody. But Ulery stated the opposite under oath. *Compare* Dkt. 121-1, 61:4–22 (Ulery's deposition testimony) *with* Dkt. 131 at ¶ 42 (counsel's misrepresentation).

The Court does not take this carelessness lightly. As experienced and respected counsel, Ulery's attorneys know better than to make misleading and unsupported factual contentions. In addition to wasting court resources, this strategy

strains the bounds of proper advocacy. And, as counsel may be more interested to know, it doesn't persuade. "District courts are 'entitled to expect strict compliance' with Rule 56.1, and do not abuse their discretion when they opt to disregard facts presented in a manner that does not follow the rule's instructions." *Gbur v. City of Harvey*, 835 F. Supp. 2d 600, 606-07 (N.D. Ill. 2011); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994).

The Court exercises that discretion today. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Smith v. Finkley*, 10 F.4th 725, 730 (7th Cir. 2021). That's particularly true in this case, where "a video record of the events at issue can evaporate any factual dispute that would otherwise exist." *United States v. Norville*, 43 F.4th 680, 682 (7th Cir. 2022). To the extent the Parties dispute Ulery's demeanor in the squad car, the Court resolves all factual disputes "in the light depicted" by the video, without favoring the nonmovant. *Scott v. Harris*, 550 U.S. 372, 380-81 (2007); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (applying *Scott* to videos).[1] As for events not caught on video, the Court "disregard[s] the portions of the Parties' Local Rule 56.1 submissions that make legal arguments

---

[1] The Court pauses here to provide a warning. If this Court's prior opinions didn't make this point painfully clear, *see Trexler v. City of Belvidere*, 716 F. Supp. 3d 662, 666 n.3 (N.D. Ill. 2024), then let this opinion attempt to dispel all doubts. The Court doesn't cotton to counsel's mischaracterization of video evidence. Mischaracterizing what the undersigned can plainly see is problematic on many levels. Don't do it.

and assert legal conclusions, which are not factual statements at all." *Rivera v. Guevara*, 319 F. Supp. 3d 1004, 1018 (N.D. Ill. 2018).

As should be evident, the Court has scoured the record and analyzed the record evidence, particularly the video recordings. And, having determined which facts were not genuinely disputed, the Court then viewed those facts and all reasonable inferences in the light most favorable to Ulery. So, the Parties can rest assured that the Court complied with Local Rule 56.1 and Federal Rule of Civil Procedure 56 as well as controlling case law in deciding this motion. That exhaustive review confirms that any factual disputes between the Parties are neither genuine nor material.

### a. Officer DeLacy

Both of Ulery's claims arise under 42 U.S.C § 1983, which "provides a remedy for violations of federal rights committed by persons acting under the color of state law." *First Midwest Bank Guardian of Estate of LaPorta v. Chi.*, 988 F.3d 978, 986 (7th Cir. 2021). Though Ulery labels the claim against Officer DeLacy as one of "deliberate indifference," "that provision does not apply until a suspect has been convicted. The governing standard at the time of arrest is the Fourth Amendment's ban on unreasonable seizures." *Sides v. City of Champaign*, 496 F.3d 820, 828 (7th Cir. 2007) (citing *Graham v. Connor*, 490 U.S. 386, 394–95 (1989)).

To prevail on a Fourth Amendment claim, Ulery must prove that Officer DeLacy was unreasonably inattentive to his serious medical needs, as determined by four factors: "(1) whether the officer has notice of the detainee's medical needs; (2) the seriousness of the medical need; (3) the scope of the requested treatment; and (4)

police interests, including administrative, penological, or investigatory concerns." *Ortiz v. City of Chicago*, 656 F.3d 523, 530–31 (7th Cir. 2011); *see Lopez v. City of Chicago,* 464 F.3d 711, 718 (7th Cir. 2006). Not every factor applies in every case. *E.g.*, *Florek v. Vill. of Mundelein, Ill.*, 649 F.3d 594, 600 (7th Cir. 2011). Rather, "the intuitive, organizing principle is that police must do more to satisfy the reasonableness inquiry when the medical condition they confront is apparent and serious and the interests of law enforcement in delaying treatment are low." *Id.*

Consistent with the Seventh Circuit's guidance to flexibly apply these factors to the needs of a case, the Parties and the Court agree that the first factor decides Ulery's claim. *See* Dkt. 109, 3–8; Dkt. 121 3–5. "If an officer has no reason to think that a person needs medical help, then failing to summon or provide medical assistance is not objectively unreasonable." *Braun v. Vill. of Palatine*, 56 F.4th 542, 551 (7th Cir. 2022). That's true in this case, where nothing in the record shows that Officer DeLacy knew Ulery needed medical assistance. While in the squad car, Officer DeLacy didn't observe any symptoms of a medical emergency. Ulery sat upright in the backseat—awake, alert, and perfectly responsive to the routine booking questions.[2] Again, Ulery entered and exited the vehicle without assistance.

Ulery nitpicks these characterizations and then some. He argues that the video of his arrest is incomplete and "open to interpretation" because he suffered from

---

[2] The video evidence firmly resolves factual disputes about Ulery's level of comprehension. Dkt. 122-1 at 15:26. When asked in the squad car, Ulery provided routine background information: name, address, date of birth, highest level of education, and background about the incident (including what he ate for breakfast that morning). He answered rapid-fire questions without difficulty. Then, to prove his mental acuity, Ulery volunteered his wife and daughter's birthdates, too.

muscle spasms, partial paralysis, and disoriented speech during his arrest. Dkt. 121, 4. But those contentions aren't in the record. Ulery testified at his deposition that he first experienced partial paralysis days after his arrest. Dkt. 121-1, 61:4–22. And on video, he says, "Pretty much you can ask me any psychological question and I can answer it." Dkt. 112 at 15:25. "I'm completely fucking aware, I'm completely sane." *Id.* at 15:26.

Based on this spilled and scattered narrative, Officer DeLacy reasonably believed Ulery was suffering from non-emergent drug withdrawals. Ulery never reported any symptoms of serious drug withdrawals, poisoning, or involuntary intoxication—no vomiting, diarrhea, loss of consciousness, loss of motor control, drowsiness, weakness, or shortness of breath. Nor does Ulery exhibit these symptoms on video. As far as the record shows, Ulery's only observable symptom in Officer DeLacy's presence was his self-avowed "erratic" behavior—not at all an uncommon reaction to sitting in a squad car while withdrawing from meth. Dkt. 121 at 5. If Officer DeLacy noticed that Ulery experienced "difficulty walking"[3] to the Jail, that observation wouldn't put him on notice of a serious medical condition, either.[4] And there certainly was no notice of a spinal injury that needed treatment, assuming an injury existed before Ulery's fall at the Jail.

---

[3] Ulery testified at his deposition that he had trouble walking from the squad car to the Jail, but noted, "it wasn't very far to walk." Dkt. 122-1 at 37:16–23.
[4] Ulery also argues that Officer DeLacy should've known of his serious condition because he repeatedly claimed to have been poisoned. But even by Ulery's account, this wasn't a medical emergency; he informed Officer DeLacy that he'd been poisoned for about thirty days and that he usually felt fine. Then, he switched topics. Dkt. 112 at 14:57.

Just as the first factor strongly favors Officer DeLacy, none of the remaining factors suggest that Officer DeLacy's failure to take Ulery for treatment was objectively unreasonable. In almost five years since the incident, no medical provider has concluded that Ulery suffered from an objectively serious condition. *Cf. Est. of Perry v. Wenzel*, 872 F.3d 439, 454 (7th Cir. 2017) (reversing grant of summary judgment to defendant officers who watched Perry suffer several seizures and writhe in pain on the floor—covered in blood, urine, and feces). And considering this lack of evidence, the requested laboratory testing was excessive. Under the totality of the circumstances, no reasonable jury could conclude that Officer DeLacy violated Ulery's Fourth Amendment right to reasonable medical care.

b. Winnebago County Sheriff's Department[5]

Ulery's claim against the Winnebago County Sheriff's Department meets the same fate for a different reason. Although both claims arise under § 1983, the difference between individual and governmental liability is a key feature of the statute's doctrinal structure. *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021). A Sheriff's Department, as a unit of local government, can be a "person" for § 1983 purposes, but is only liable for "its own violations of the federal

---

[5] Ulery's amended complaint names as a defendant the "Winnebago County Sheriff's Department." Dkt. 11. But the Winnebago County Sheriff's Department is not a proper or suable defendant under Section 1983. *See Smith v. Knox Cty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012); *Sow v. Fortville Police Dept.*, 636 F.3d 293, 300 (7th Cir. 2011); *Whiting v. Marathon Cnty. Sheriff's Dep't.*, 382 F.3d 700, 704 (7th Cir. 2004). For whatever reason, the Winnebago County Sheriff's Department never raised this fundamental problem. Dkt. 115, 117, 132. The Court will simply view this as a misnomer and oversight by the Parties and construe the "Winnebago County Sheriff's Department" to mean the "Winnebago County Sheriff."

9

constitution and laws." *Id.*; *Juniel v. Park Forest-Chi. Heights School Dist. 163*, 176 F. Supp. 2d 842, 848 (N.D. Ill. 2001). "Note the qualifier: 'its own violations.'" *First Midwest Bank*, 988 F.3d at 986. To prevail on a *Monell* claim, Ulery must "challenge conduct that is properly attributable" to the Sheriff's Department. In making that decision, courts look "broadly to the customs, policies, or practices that are alleged to contribute to the individual misconduct." *Cadiz v. Kruger*, No. 06 C 5463, 2007 U.S. Dist. LEXIS 88458 at *9 (N.D. Ill. Nov. 29, 2007).

Ulery fails to identify any constitutional injury that is properly attributable to the Winnebago County Sheriff's Department. The Sheriff's Department can't be held liable under Section 1983 for the actions of Rockford police officers. And, under Section 1983, it's not liable for the actions and inactions of county jail employees unless there's a showing that a Sheriff's policy, custom, or practice caused the constitutional violation complained of. When the Court removes those separate entities from the discussion, the factual support for Ulery's *Monell* claim boils down to this:

> Officer Cox observed Mr. Ulery fall from this machine onto his back and tailbone. Immediately following the fall, Officer Cox asked Mr. Ulery if he was ok. This suggests that Officer Cox appreciated the inherent and obvious danger of such a fall. Such a fall could result in a traumatic injury, such as a disk herniation. This objective danger was realized, albeit in an unnecessarily delayed manner.
> Dkt. 124, 4.

There are lots of problems with this argument. Chiefly, Ulery's personal experience with a single employee doesn't establish a custom, pattern, or practice as required by *Monell*. There's no evidence that any other inmate has ever fallen from the body

scanner at the Winnebago County Jail, or that employees of the Winnebago County Sheriff's Department are routinely indifferent to the inmates' medical needs. Similarly, as the Sheriff's Department notes, it's not liable under Section 1983 merely because of a supervisor's actions or inactions. *First Midwest Bank*, 988 F.3d at 986. So, even if a reasonable jury could somehow find that Deputy Cox violated Ulery's constitutional rights,[6] that behavior alone doesn't establish liability of the Winnebago County Sheriff's Department. An isolated episode does not a pattern make. *See Tellis v. U.S. Fid. & Guar. Co.*, 826 F.2d 477, 479 (7th Cir. 1986).

## III. Conclusion

For the reasons already stated, the Court grants both Motions for Summary Judgment [107, 115] and releases jurisdiction over Ulery's state-law claims. *RWJ Mgmt. Co., Inc. v. BP Prod. N. Am., Inc.,* 672 F.3d 476, 479 (7th Cir.2012) ("When all federal claims in a suit in federal court are dismissed before trial, the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims.").

Entered: April 10, 2025

By: _____
    Iain D. Johnston
    U.S. District Judge

---

[6] Unlikely, given the third problem: Ulery treats a common courtesy as a per se constitutional violation. He never explains how Deputy Cox's question proves his deliberate indifference to Ulery's medical needs.